This court, my name is Timothy C. Harlan. I represent the appellant in this action. What the court needs to address, I believe, and we always have in the background the, I would say thousands of cases talking about substantial evidence on the record as a whole, is there must be a medical basis for the residual functional capacity. The second issue, I believe, is the treatment of the treating physician, Dr. LaMonda. Well, there has to be some medical support. Yes. The RFC determination is the Social Security ultimate determination that is in the agency's job description. Yes. Our cases have discussed that at great length and very often and I think are in quite harmony. And the lawyers who argue, well, the RFC is a medical decision, so the ALJ made a mistake by doing it by himself or herself, those arguments don't prevail. So I'm not sure where you're going with that. Well, Hutzel and Lauer are the two cases that I'm referring to where they talk about the ALJ having a medical basis. They even use the word medical decision. Now, it is the decision of the agency. I would entirely agree with that. And as the court knows this case as well. But doctors don't do RFC, residual functional capacity determination. That's correct. They provide input. ALJ relies on that input. There's input here and it's ambiguous if not inconsistent. For instance, the government relies on the fact that they use the term the surgeries referring to the first three surgeries, two bilateral carpal tunnel and an X surgery. The surgeries were largely effective. A strange term at least to me on page 12 of the government's brief, because Dr. Havey did two bilateral carpal tunnel surgeries in short order, continued to say it's getting better. In fact, after the next surgery, Dr. Havey says when Dr. Parker says we have a solid fusion, but then he adds his neck is stiff and has pain, his hands are numb, and he has 70% of the range of motion in his neck that I would expect. Then following that, we have very objective evidence, which is EMG nerve conduction study by a neurologist who describes it, this is after two carpal tunnel surgeries, as severe bilateral carpal tunnel surgery and mild issues with the nerves in the neck. So the appellate is referred to a third orthopedic surgeon who says this is why I don't do these with a scope. I want to do a full cut and see what I'm getting. There's another carpal tunnel surgery, which is not very successful, but says he really needs a fourth. He needs one on the other hand too. So to rely on Havey saying these were successful when one is repeated and the other orthopedic surgeon says the second one should be repeated, I think is not appropriate evidence for the ALJ to say he is giving great weight to these two doctors. Giving great weight to what part? Is he giving great weight to Dr. Parker saying 70% of the range of motion, his hands are numb? That's not clear at all. Well, of course, I mean, a need for surgery does not equal disabling. No. No, it's not. Both the physicians and the ALJ have to deal with that uncertainty or ambiguity. But to say that they're largely effective, use that term, and it clearly wasn't effective enough to avoid another surgery, I think is not enough appropriate medical evidence on which to base an RFC. The other difference in this case that is very unusual is that Dr. Gary LaMonda is an internist. He has taken care of the appellant for 25 years. He is the person who referred them to these various surgeons. Dr. LaMonda explains at great length, pages 13 and 14 of the transcript and interrogatories, and pages 504 to 522, of exactly what Dr. Parker is talking about. His opinion is just drafted to guarantee a finding of disability if it's believed. His interrogatory, the reason for the remand, to investigate an opinion which, of course, I don't think any VE would say if he has to, if he can't stand for more than 15 minutes and can't sit for 30 minutes and he's got to lie down 30 minutes every two hours, well, we know what the answer is going to be. So a physician who's asked to opine by a claimant or a claimant attorney and comes up with that is not fully credible. There's going to be some discounting of that, and the question is, where do you go from there? If you go from there, pages 504 to 522, where he explains under oath what the surgery means, what the surgeon did. No, this is a statement under oath that was provided from the doctor. He explains what the doctors are talking about. He explains what the surgeons did. When they say that there's a problem, this is what happens, and this is what he sees and has seen for all these years that he has treated them. Now, it is correct that the treatment drops off, and there are two places in the records referring to that. He doesn't have a job. He doesn't have insurance. This case has gone on for nine and a half years, and he is unable to get much medical treatment, but he does see Dr. LaMonda and is able to do that. It's our position to say you're giving great weight to an orthopedic surgeon who does neck surgery who also says his hands are numb. The hands may be numb for an issue entirely unrelated to the neck surgery. Just like the range of motion is predictable following the neck surgery, the reality of it is the spondylosis would cause numbness in the hands in any event. And the question isn't really do you have numbness in your hands. The question is, is it disabling? And so the real issue is you have this list of things that Dr. LaMonda says are the limitations on his abilities to engage in daily life activities, right? Yes. And the question is, is that consistent with any other evidence? I mean, do we have evidence that every half hour he lays down? Do we have evidence that he's not engaging in any other daily life activities inconsistent with that? Because at the end of the day, on the remand, what the doctor describes is a person who is completely and totally disabled from doing basically anything, and I'm not sure I see that in the rest of the record. Well, Your Honor, I don't know that you would because of the time period involved. But you do see it with the objective evidence from the neurologist. They stick needles in his back and they measure the time that it takes, and that's what he says, severe carpal tunnel syndrome. Yeah, we're not saying that, I mean, listen, the question is, can he have severe carpal tunnel syndrome and still be able to carry on other jobs that exist in significant numbers in the national economy, right? Yes, and the ALJ says he can use his hands frequently. That just doesn't make any sense that he has severe carpal tunnel syndrome, shown by the neurologist, and the next surgeon talks about numbness in his hands, yet he is going to use his hands two-thirds of the day. That just doesn't make any sense at all. For occasional fingering? Yes. And what is it, sedentary, either light or sedentary work with considerable restrictions? Yes, but his restriction on the hands is not, I think two-thirds of the day, not terribly significant. But where the ALJ ends up, which is at page one of the reply brief, is stand to walk six to eight hours a day and occasionally stoop, kneel, crawl, crouch, frequently reach, only occasionally overhead, frequently handle finger and feel. Those are just not things that are consistent with the medical evidence. I thought it was occasional, not frequent. It was occasional the first time, right? There was a first RFC before the remand that had occasional and the next one had frequently? Is that the way things work out? Whereas maybe a constant that is moved down ends up being frequent and not constant. Tell me what you just said. Well, when he ended up at page 562 with frequent, that is a step down from constant, which had been a prior comment, and the ALJ, which is certainly appropriate. But the final RFC in this case, do I understand correctly, is a frequent. Frequently? Yes. Frequently handle finger and feel, right? Yes. And I think that is inconsistent with the comments starting with Dr. Parker, the next surgeon, the EMG NCS from the neurologist, and the comments from Dr. LaMonda, who has treated him for a long time. As the Court is aware, the old treating physician rules count that for something, as opposed to the one-time or short. There are even cases with two or three examinations by a treating physician that say, well, that is not very much. But Dr. LaMonda has been with him a long time. The idea is Dr. LaMonda should know when he is being truthful and when he is not. Well, if he treated him for 20 years, many of those years he was a heavy equipment operator. Yes. So it is not as though this has to lie down 30 minutes every two hours opinion is the product of 20 years of observation. No, that is 20 years of observation. That was a post-hearing submission. The 25 years is the seeing him, observing him. The line down, the other restrictions are post the four surgeries. But that was the reason for the remand, right? Yes. The Appeals Council said to the ALJ, we need an analysis of this post-hearing. Well, remember this is the second time we have been in this court. We were here for a very short period of time before the government asked for the remand to go back. Again, that is why the case is taking so long. But I would like to, if it is all right, to reserve my last two minutes. Thank you. Mr. Fox? May it please the court. I am John Fox and I am here on behalf of the Acting Commissioner of Social Security, Nancy Berryhill. As I understand it, the only issue before the court today is really RFC and whether there is substantial evidence in the record to support the ALJ's RFC finding. As everyone knows, if there is substantial evidence to support the ALJ's RFC finding, the decision would be affirmed. I did not take the argument on appeal as being that. I took it as being more specific than that. There was not a proper evaluation of the treating physician's opinion. Judge, perhaps I was speaking at too high a level of generality and you are absolutely correct. Mr. Harlan has raised the issue, and I will try to go through them in the order that he presented them. He has raised the issue of whether the ALJ properly weighed Dr. LaMonda's treating opinions. And he has also raised the more general issue, I believe, of whether there is substantial evidence in the record to support the ALJ's RFC findings, including the limitation to frequent fingering and feeling, frequent handling fingering and feeling. In terms of Dr. LaMonda's opinion... Can I interrupt you? Yes. Now, the first time, am I right on the facts here, that before the first ALJ, before the remand, it said occasionally finger, feel, and all that, right? Now, Judge, I don't have the first ALJ decision in front of me, though I have reviewed it. I cannot say specifically whether it was occasional handling. I do know that it was a fuller range of light work in the sense that the new ALJ decision limits plaintiffs to lifting and carrying up to 10 pounds, I believe. Counsel, I thought it was clearly occasionally the first time. Can you determine what it is in a second? That's important to me. I cannot determine that. Okay. Well, we'll figure it out. Okay. Yes, and I'm sorry about that. Okay. Well, now, let's suppose for a second, then, so you don't dodge it entirely. Let's suppose that the first time, before the first ALJ, it said occasionally handle, finger, and feel. Okay. Now, let's suppose on the second time it said frequently. Boy, isn't there something amiss if that's true. No, I don't think so, Judge. I think that what you're dealing with is a situation where you have overlapping but not completely similar records. The first ALJ decision was issued in October of 2010, and that was shortly after plaintiff had recovered from his cervical procedure and then his carpal tunnel surgeries. At that point, Dr. LaMonda's first opinion was in the record, but his telephonic opinion was not. It was added to the appeals council. So the record before the ALJ at that time went from between 2007 to 2010. The new ALJ decision includes Dr. LaMonda's telephonic interview. It also includes the relatively limited treatment records that occurred after October 2010. And then critically, it includes Dr. Velez's consultative examination. And I think if you look at the handling limitations in the new ALJ decision, you'll see that Dr. Velez's consultative examination played a role in those. Specifically, what's really relevant here is that Dr. Velez's consultative examination is relatively normal. The only limitations he finds is that plaintiff has what he characterizes as a slight reduction in grip strength on the right side, and he also says that plaintiff would have some difficulty in finger positioning on the right that could affect manipulation. There are no limitations on the left side. And so what you're talking about here in the second ALJ decision is that plaintiff has required little treatment for his carpal tunnel syndrome over a period of four years. And then to the extent he's received treatment, he's reported that he got a good result. And then you have a consultative examiner who looks at him after the relevant period and finds no limitations in his left wrist and only slight limitations in his right wrist. And so I would not be surprised at all on this record if the ALJ would find fewer limitations than on the previous record, Judge. Dr. LaMonda's opinion, the ALJ gives several reasons for discounting it. These are also really the same reasons the ALJ gives for his RFC finding and for finding plaintiff not entirely credible. What it begins with is the opinions of plaintiffs treating specialists and surgeons. Those opinions were issued towards the beginning of the relevant period. Plaintiff injured his back while working as a heavy equipment operator in June of 2007. His treating physician, Dr. LaMonda, refers him to specialists and surgeons to deal with his pain complaints. Dr. Havey deals with carpal tunnel syndrome. He performs two carpal tunnel release procedures. And by January 2008, Dr. Havey has seen enough improvement that he says plaintiff can return to work pending his neck condition, which Dr. Parker is treating. Dr. Parker performs a cervical discectomy infusion procedure. By April 2008, Dr. Parker has seen so much improvement that he is saying plaintiff can return to work consistent with light-duty activities. Certainly not the job you've done in the past as a heavy equipment operator, which confusingly is a medium-level job because you're not carrying heavy items as much. So Dr. Havey and Dr. Parker have essentially released plaintiff to return to a range of work at that point. The third specialist, Dr. Meyer, is a pain specialist. And he treated plaintiff from before the relevant period even began. In, I believe it's July of 2008, Dr. Meyer examines plaintiff. And plaintiff has several pain complaints. But Dr. Meyer characterizes his remaining limitations as relatively mild overall. Dr. Meyer makes the point that, unfortunately, plaintiff is not employed and appears to lack motivation to find appropriate work. And Dr. Meyer basically says the limitations that I see are not consistent with disability. He does perform a surgery, though. Dr. Meyer does not. I thought Dr. Meyer did a surgery, bilateral C7T1. Who did that? The first carpal tunnel procedures were performed by Dr. Havey. Then in December of 2009, there was a follow-up procedure on the left, non-dominant wrist. And that was Dr. Turnbaugh who performed that procedure. And plaintiff, after that procedure, reported improvement. There was very little medical treatment after that interval, after approximately. I thought in July of 2008 he had a surgery. Is that incorrect? Could you say that one more time? I would be happy to. I swallowed it. In July 2008, did he have a surgery? That's neck surgery, isn't it? Yeah. In July of 2008, the neck surgery had already resolved. Dr. Meyer performed a therapeutic injection, and that would have been probably in July 2008. Okay, I guess we're quarreling about terms because it says under moderate sedation. A surgery under moderate sedation. Did one of those occur in July 2008 or not? A therapeutic injection, yes. So you could call that surgery, yes, sir. And so that occurred in July of 2008. Thank you. The treatment after that was relatively limited. Again, until late 2009, approximately December 2009, when plaintiff reported some recurring problems with his left non-dominant wrist. At that point, Dr. Turnbaugh performed a carpal tunnel release, which would be the second on the left wrist, third overall. And then from that period through the end of the relevant period in 2012, there's virtually no medical treatment whatsoever. That lack of medical treatment, as ALJ explains, supports the inference that the treating physicians also raised that the surgeries were relatively successful. Now, relatively doesn't mean that they were perfectly successful. And the ALJ's RFC finding reflects that this is a gentleman who still has significant limitations. The ALJ credited Dr. LaMonda's opinion that plaintiff cannot carry or lift more than 10 pounds. Now, the ALJ didn't credit everything Dr. LaMonda said. The idea that he would be limited in terms of sitting or standing finds virtually no support in the record. There's just nothing to support that. But to the extent he said that plaintiff would have difficulty lifting and carrying more than 10 pounds, the ALJ found that that was well supported. Even though consultative examiners would not have even supported that much of a limitation. The consultative examiners, Dr. Kitchen in 2008 and Dr. Velez in 2013, both found that this gentleman had almost full strength. I think both of those consultative examinations would have supported at least a full range of light work, if not medium or heavy work. And so the ALJ explicitly assigns those consultative examinations less weight in order to reach a more restrictive RFC finding. Now, plaintiff has characterized the limitation of frequent work as virtually meaningless. And that is certainly not the case. Under Social Security parlance, frequently means up to two-thirds of the work day. By limiting plaintiff to no more than frequent handling, fingering, or feeling, the ALJ was recognizing that this gentleman cannot perform repetitive or constant movements with his hands. Many jobs require repetitive and constant movement with your hands. Many assembly jobs involve using your hands to put things together. I'm not positive of this, but his driving job would likely require repetitive or constant handling because you're driving a truck and you're moving a steering wheel. You're moving a gear shifter. Lots of jobs require repetitive or constant handling. A limitation to frequent is in fact significant. On top of that, remember that Dr. Velez found no handling limitations with respect to plaintiff's left hand. His left hand had no limitations at all. His right hand had slightly reduced strength and some difficulty with finger positioning. That is what explains the handling limitation, is slight limitations on one hand. Based on that, the ALJ limited plaintiff to frequent handling. The ALJ's RFC finding draws support from, as I said, the opinions of treating specialists and surgeons, Drs. Havey and Dr. Meyer, and I'm forgetting one. And then in addition, the ALJ's finding draws support from the consultative examiners, Dr. Velez and Dr. Kitchen, who examined plaintiff almost four to five years apart but reached very similar findings. It also draws support from the relative lack of treatment after July 2009 when Dr. Meyer examined plaintiff. I believe that was the name I was forgetting earlier. And the ALJ also credited Dr. LaMonda's opinion, but only to the extent it found support in the record. This is a very well-supported RFC that's very easy to understand based on the evidence before the ALJ. And judges, unless you have any further questions for me, I would yield my remaining time. Thank you very much. Judge Benton, that surgery term was a little confusing to me, too. But the pain physician uses the term that he did surgeries. That's where that comes from. Now, remember, any time you go to Dr. Meyer, what was the first thing that Dr. Meyer said? I will not participate in the disabling process. Because, he says, I am going to help him. Which I would have some disagreement with. But Dr. Meyer is just not a good place to look for opinions because he says, at page 248 of the transcript, is a significant disc bulge, moderate and central foraminal stenosis. But also, I am not going to participate in the disabling process. The reliance on Dr. Parker and Dr. Havey, as I said, I think is mistaken because the later evidence proves that to be wrong. And even Dr. Parker, as he is seeing him toward the end, has problems. I don't understand your point with respect to Dr. Meyer. It sounds like you are saying a doctor who declines to attempt to give opinions as to work ability or disability somehow does not provide objective medical evidence that the ALJ can take into account. No, I think that is wrong. The objective medical evidence that he provides actually is very helpful because he keeps on doing these pain treatments. You just want us to dismiss a doctor because he didn't give an opinion. I only want you to dismiss his opinions, which he starts out saying he is not going to give. He says I am not going to participate in this. And then he does have some comments about that. But he certainly supports the record by continuing to do these surgeries, as he calls them, for the pain. The government at page 16 of their brief states that the plan of surgeries have resolved many of his symptoms. Well, that is the issue. He has got lots of symptoms. And Dr. Velez is seven years after the alleged onset date. He is in 2013. He sees him one time, but you cannot just dismiss a limitation of the use of one hand with a man who is tested as illiterate and has completed the seventh grade twice. This is not a man that can do anything that is going to require other than manual labor. So my time is up, and I appreciate the court's time. Thank you. Thank you, counsel. The case has been well briefed, I argue.